UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

Sang K. Park, Esq.
Virginia Bar No. 30362
Moon, Park & Associates
Attorneys at Law
7617 Little River Turnpike, #800
Annandale, VA. 22003
*Local Counsel for Plaintiff*

Michael S. Kimm, Esq. (*Pro hac vice*)
KIMM LAW FIRM
333 Sylvan Avenue, Suite 106
Englewood Cliffs, New Jersey 07632
T: 201-569-2880
*Attorneys for Plaintiff Sae Han Sheet Co., Ltd.*

| | |
|---|---|
| SAE HAN SHEET CO., LTD.,<br><br>        Plaintiff,<br><br>  v.<br><br>EASTMAN CHEMICAL CORP.,<br>COMMONWEALTH LAMINATING AND<br>COATING, INC., CPFILMS INC. (A<br>DELAWARE CORP), SUNTEK HOLDING<br>COMPANY (A DELAWARE CORP),<br>2010 ACQUISITION CORP.<br>(A DELAWARE CORP.) AND<br>EASTMAN PERFORMANCE FILMS, LLC,<br><br>        Defendants. | 4:18-CV-74<br><br><br><br><br><br>**First Amended Complaint with Jury Demand** |

Plaintiff Sae Han Sheet Co., Ltd., sues the above-named defendants and for its first amended complaint states:

## THE PARTIES

1. At all relevant times plaintiff was and still is a company engaged in international trade and having

1

its principal place of business in South Korea. Plaintiff is authorized to do business in the State of New York.

2. At all relevant times defendant Eastman Chemical Corp. or Company has been a business entity organized under Delaware law with its Corporate Headquarters at 200 S. Wilcox Drive, Kingsport, TN 37660, and corporate offices and facilities in numerous places including a manufacturing plant at 2000 Brunswick Avenue, Linden, NJ 07036. Defendant Eastman Chemical conducts business throughout the 50 states and the world; defendant Eastman is registered and authorized to do business in the State of Virginia.

3. At all relevant times, defendant Commonwealth Laminating and Coating, Inc. (Commonwealth Laminating) was a Virginia company having its address at 1450, Beaver Creek Dr, Martinsville, VA 24112. This entity is believed to have manufactured some of the products giving rise to this action. Defendant Commonwealth Laminating was acquired by defendant Eastman Chemical on or about December 14, 2014, according to Eastman Chemical's press releases.

4. Plaintiff's original complaint named the foregoing defendants and named various "John Doe" and "ABC companies" as fictitious entities whose actual identities were unknown to plaintiff. In defendants' memorandum of law, ECF22, 01/04/19, filed in support of their Rule 12(b)(6) motion they disclosed:

> On or around December 12, 2014, Commonwealth was acquired by CPFilms Inc. (a Delaware corporation), which was an indirect subsidiary of Eastman. Commonwealth subsequently merged into SunTek Holding Company (a Delaware corporation), on January 19, 2016. SunTek was Commonwealth's parent, and both were affiliates of Eastman. SunTek Holding Company merged into 2010 Acquisition Corporation (a Delaware corporation) on January 29, 2016. 2010 Acquisition Corporation was SunTek's parent and an Eastman affiliate. On or around February 1, 2016, 2010 Acquisition Corporation merged into CPFilms Inc. (a Delaware corporation), an indirect subsidiary of Eastman, and Commonwealth ceased to exist as a separate entity. CPFilms Inc.

converted to a limited liability company on January 1, 2018, and changed its name to Eastman Performance Films, LLC.

5. Accordingly, plaintiff has added the new entity identities (CPFILMS INC., A DELAWARE CORP., SUNTEK HOLDING COMPANY, A DELAWARE CORP., 2010 ACQUISITION CORPORATION, A DELAWARE CORP., AND EASTMAN PERFORMANCE FILMS, LLC) in the caption for technical joinder.

6. Based upon defendants' disclosure, it is now apparent that Commonwealth has become Eastman Performance Films and this entity is a subsidiary of Eastman Chemical.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this action under 28 U.S.C. § 1332(a) as this matter involves a controversy in excess of $75,000 exclusive of costs and interest and the parties are citizens of different states or alienage.

8. Under 28 U.S.C. 1391(b), venue is proper in this district because substantial part of the events giving rise to this action occurred in this district and based upon the general conduct of business by defendant(s) giving rise to personal jurisdiction.

## FACTS COMMON TO ALL CLAIMS

### Plaintiff's Establishment of the Suntek Business in South Korea

9. In December 2014, defendant Eastman Chemical became the successor-in-interest of a certain written supply chain agreement previously made in March 2008, which was then converted into a verbal supply agreement for an indefinite duration, as of approximately December 13, 2013, between plaintiff and defendant Commonwealth Laminating.

3

10. Since 2008 plaintiff has been purchasing and re-selling, as a national distributor in South Korea, certain "Suntek" brand of "glass tinting film" commonly applied to automobiles and office windows to serve as (1) sun shader; (2) UV blocker; (3) heat and glare reducer; (4) privacy enhancer; and other such benefits. Since the time of plaintiff's business dealings with Commonwealth, defendants have held Suntek brand essentially as providing these features and benefits to consumers:

> High impact marketing materials and programs
>
> A complete product line, available in several colors and shades, that matches factory tint and enhances the look of any vehicle
>
> Easy installation, including heat shrinkability, adhesion, and dry time
>
> Superior solar performance including heat and UV rejection, as well as glare reduction
>
> Exceptional optical clarity
>
> Increased safety and protection
>
> A competitive Manufacturer's Warranty

See http://suntekfilms.com/automotive/suntek-window-films-automotive.aspx.

11. In 2008, Commonwealth Laminating requested plaintiff serve as its "exclusive distributor" in South Korea when Suntek had little or no market share in South Korea due to a general lack of competitiveness. By December 2013, as plaintiff cultivated a strong, increasingly competitive market for Suntek products in South Korea, between 2008 and 2013, Commonwealth cited plaintiff's "inability to meet" sales minimums as a basis for terminating the 2008 Exclusive Agreement and unilaterally converted it to a non-exclusive, verbal agreement, by an email dated December 13, 2013:

> Due to SaeHan Sheet's consistent inability to meet the purchase requirements, we must

terminate the agreement. You will be able to continue to purchase SunTek products from CLC in 2014, however, you will not be the exclusive distributor of SunTek products in 2014. Going forward into 2014, you may say that you are an authorized SunTek distributor, but not the exclusive SunTek distributor.

12. As of December 13, 2013, plaintiff continued to purchase Suntek products through the end of 2016 and would have continued with this business other than due to defendant's acts and omissions.

13. During the course of its nine (9) year plus sale of the Suntek product line, plaintiff made every business effort to expand the Suntek market not only for its own business gain but also in the hopes of building a stronger contractual relationship with Commonwealth and, subsequent to the December 2014 merger and acquisition by Eastman Chemical, with the latter.

### Defendant Strategic Change of Ingredients

14. In corporate parlance, the term "cost cutting measure" is the same as the expression, "increased profitability." Contemporaneous to its acquisition of the Suntek product line and the business of Commonwealth Laminating, defendants Eastman Chemical undertook a post-merger "profitability review" of the Suntek product line. Upon information and belief, defendant Eastman Chemical came to a decision, within its upper management, that "cost cutting measures" based upon the elimination of ingredients.

15. As previously manufactured by Commonwealth, the Suntek tinting film involved three (3) principal ingredients in the manufacturing process and one of these was quietly decided to be removed.

16. To Saehan and presumably all of their customers, defendants represented that the product line that existed as Suntek tinting film, as manufactured by Commonwealth, was being continued to be manufactured in the "same manner," after the merger. Before and after the 2014 merger of Commonwealth

5

and Eastman, agents of Commonwealth including Jerry Robertson visited and otherwise communicated with plaintiff and represented that the same product line would be continued to be manufactured using the same materials and processes as Commonwealth had established. On December 10, 2015, Jerry Robertson came to Seoul, and we met at the Marriott Hotel in Seoul and had one such discussion. He assured plaintiff at that time that nothing would be changed and the same product would be continued indefinitely and, if any change were to be forthcoming, Sae Han would be the first to know.

17. In fact, from approximately latter 2015 or early 2016, defendants began to manufacture the Suntek tinting film without a key ingredient and sold it throughout the world as the "same product" as had previously been sold despite the fact it was not the same product.

18.  Upon information and belief, defendants' internal research did not support a long term reliability and usefulness of the film product with the omitted ingredient. Despite this fact, and despite defendants' probable knowledge that the omission of the ingredient would not be beneficial to the film product line, defendants were motivated to follow a cost-reduction and/or other "corporate efficiency" strategy in the manufacturing process.

19. After defendants' deliberate decision to omit a key ingredient, all products of Suntek tinting film were no longer the same as when Commonwealth Laminating was manufacturing the Suntek line. Defendants continued to deceive plaintiff into believing that the product line had not changed at all. Plaintiff procured approximately $400,000 in 2015 and approximately $300,000 worth of products for the nine months of 2016 through September 30, 2016.

20. As a small business whose principal product line was the Suntek tinting film, being sold at wholesale to principally five retailer-customers, consistency and reliability of the product line were not only

essential but life and death.

21. Defendants' defective product line is visible with small mold-like craters that are visible throughout a sheet of tinting film much like the following example. Like mold, because it grows and creates an unpleasant visual appearance, rather than a clean, sleek sheet of film coating properly expected by end-user consumers, it is unsuitable for sale and unsuitable for even for promotional giveaways.



### Defendants' Deceptive Business Practices

22. In early October 2016, plaintiff complained of defect claims resulting in return of defective products from retailer-customers and claims from end-user consumers against the retailers. In an email dated October 10, 2016, plaintiff told the urgency of the situation to defendants:

Dear Ashley

Almost all of the SunTek films that were imported during 2016 are being returned by our distributors due to defects in the film.

We have examined all the defective films and each of the production LOT.

Please check the attached file to see the TOTAL LIST OF DEFECTIVE PRODUCTS involved.

We will send the defective film samples immediately for your verification.
The real urgency at the present time is that we do not have any inventory of NORMAL FILMS to sell or to exchange.

Therefore we must urge your company to immediately replace some of the defective films listed below as soon as
possible.
   STD50 : 5R
   HP05 : 20R
   HP15 : 40R
   HP30 : 60R
   HP35 : 40R
   CXP35 : 30R

Please send VIA AIR in order to save time and to reduce further loss to our business.

23. Defendants claimed not to know what was going on but knew or should have known exactly what was going on: their product line was suffering from a manufacturing defect. They requested explanation of what "defect" meant and plaintiff provided repeated examples and explanations to no avail.

24. Defendants had sold and delivered significant volumes of defective tinting film products to customers in approximately 2015 and 2016. Sae Han and other customers sold them to countless end-user consumers and thereby placed themselves in jeopardy of consumer liability lawsuits and claims. Defendants knew that plaintiff was selling nothing but Suntek products and that a disruption of the supply would be a

life or death event, as was discussed numerous times.

25. According to defendants' officers, in August 2016, their customer located in Germany filed a product defect claim based upon manufacturing defects which occurred after defendants removed a key ingredient from their ingredients. This story was admitted to plaintiff during the November 16, 2016, visit to plaintiff in South Korea by defendants' officers/agents Jerry Robertson and Tim Gerasimov, not in the context of disclosure but in the context of emphasizing that "the problem has been fixed."

26. Internally, defendants adopted a policy of "don't tell" other customers that their Germany customer had presented defect claims, and to disregard any more customer complaints. Thus, even on November 16, 2016, when defendants briefly mentioned that a Germany customer had returned products with a defect claim, they did not disclose the reasons behind the defect, and generally avoided the topic.

27. Knowing that defendants were exposed to liability, defendants then deployed a two-part strategy. First, they would deny that there was anything wrong with their products despite the defects and despite their knowledge to the contrary. Second, defendants offered returns if Saehan and presumably other customers signed off on general releases as a condition of defendants' acceptance of defective goods so as to sandbag and prevent plaintiff from filing any lost of profit claim stemming from the defects.

28. During October, November, and December 2016, defendants' officers and managers were engaged in an aggressive attempt to contain adverse news stemming from their knowing or reckless injection of defective products into the stream of United States commerce and global commerce. As they realized that the problem was spreading and could spread even further beyond their control, in Asia and Europe, they repeatedly urged plaintiff to sign a General Release as a condition of receiving merchantable products in exchange for a finite defects claim. They failed to take direct responsibility for their actions and

9

failed to replace the goods with non-defective goods in a timely fashion, without conditions.

29. By November 2016, defendants' failure to process the defects claim became life or death for plaintiff as plaintiff's handful of retailer-customers told plaintiff that any further defects would make it impossible to sustain the business relationship with plaintiff and those customers had already begun developing new, third-party supply lines with reliable, defect-free lines of products, believed to be non-Suntek lines, for possible change of product sourcing.

30. On November 12, 2016, defendants' officer Ashley Reynolds sent plaintiff and email in which the defendants admitted that their products were defective:

> Please see the attached sheet containing all rolls that we shipped to you this year and the batch numbers.
>
> • All rolls with purple are from the recent claim and are already approved for credit.
>
> • All rolls in dark green and labeled 100% SAFE are A grade and can be sold without any issues. These rolls are free from defect.
>
> • The rolls highlighted in Red are defective and we will include these rolls in your credit. No need to be inspected. If you have shipped this material to a customer already and it has not been installed, you may want to contact them and replace this material. (Please note that once the film is installed on glass, the defect will not form)
>
> • All rolls in yellow and light green will need to be inspected by Jerry and Tim during their visit next week. These are listed below. Can you please pull 1 roll from these and have these ready to be inspected upon Jerry's arrival to save time and avoid any delays:

31. On November 16, 2016, defendants' agents/officers Jerry Robertson and Tim Gerasimov personally visited plaintiff's plant to review and discuss the defects problem. Plaintiff told Jerry Robertson in no uncertain terms that continued defects claims would result in plaintiff's buyers abandoning the business relationship and thereby destroying plaintiff's business. Plaintiff explained that in Korean culture, the

Case 4:18-cv-00074-JLK-RSB Document 38 Filed 04/29/19 Page 11 of 18 Pageid#: 184

spreading of honorable or dishonorable business practice, through word of mouth or through social media, routinely result in the destruction of corporate lives and emphasized that plaintiff was in peril of such adverse view among its handful of retailer-customers.

32. On November 16, 2016, following the plaintiff's plant visit, in an email from Tim Gerasimov to Ashley Reynolds and Jerry Robertson, all three being officers or agents of defendants, defendants admitted that at least 202 rolls of different types of tinting film were confirmed defective and required "reimbursement" totaling $248,408 for interim reimbursement:

> Hello Everyone, Please find attached the inspection results for the rolls that we confirmed for reimbursement. There are total of 202 rolls of different type in this list.
>
> Ashley , Could you please add a column with price per film type and totals for the reimbursement and send it to Wing for approval.
>
> Thank you!
>
> Tim G

(Email with Excel attachment; Exhibit 1).

33. Before he left plaintiff's plant, Jerry Robertson repeatedly assured plaintiff in sum and substance that defendants "had already identified and fixed the problem back in August" and that "absolutely nothing shipped by you after mid August 2016 is defective; guaranteed." Plaintiff relied upon that assurance and representation and in turn told its five major purchasers that Suntek had guaranteed that there would be no returns from its product line, after the mid-August 2016 manufacturing time-line.

34. On November 21, 2016, at 9:25AM, defendants' officer Jerry Robertson wrote plaintiff an email requesting "your current SunTek inventory by product and VLT, and by batch number. (This can include any rolls returned to you for the defect)." Although this was couched as an innocuous "inventory

11

check" request, in fact it was an attempt to assess defendants' exposure for returns based on goods on hand and goods that have been returned at Saehan.

35. On November 22, 2016, plaintiff responded:

Dear Jerry

As you may well know our inventory at the present time is a mix of returns and past inventory and needs to be verified on paper as well as what's in stock. In addition, with returns coming in almost daily our inventory is bound to change as time passes. I do not see the point of reporting our current inventory situation which will continue to change until all the defective films are recalled and completely quarantined. Would you please let me know the reason for your request?

36. Defendants failed to respond to plaintiffs' foregoing email but plaintiff then provided then-current status of inventory. Despite these facts, defendants still failed to refill the defective goods with non-defective goods and failed to reimburse plaintiff's purchases and financial losses and abject failed and refused to prevent plaintiff's losses. Plaintiff's initial financial losses were at least $248,408 in defective goods "confirmed" by defendants.

## The Closure of Plaintiff's Business

37. Despite the interim-confirmation of approximately $250,000 in defective goods, which plaintiff had previously paid for, defendants failed to reimburse plaintiff's loss or replace the defective products.

38. The five purchasers that comprised the majority of plaintiff's retailer-customers were known to defendants; and they were:

    A. Global Industry, CEO Park Minwoo, Pocheon City, Gasan-myon Sunma-ro #150, Gyeong-gi-do, South Korea;

    B. Sunline, CEO Park Inho, Joong-ryang-gu, Mang-woo-dong #260-7, Seoul,

South Korea;

    C. Kopel Navitech, CEO Lee Kwangwoo, Kwang-yuk-si, Seo-gu, Gajang-dong, Daejun, South Korea;

    D. Daego Company, CEO Park No-uk, Joong-gu, Namsan 3-dong #2114-22, Daegu, South Korea;

    E. Shinhwa Company, CEO Suh Choonshik, Kwang-yuk-si, Bukku, Shiandong #495-13, Kwangju, South Korea.

By early 2017, with no solution from defendants, and thus no solution from plaintiff, and with defects-claims mounting more and more, all five customers of plaintiff ceased doing business with plaintiff citing the lack of adequate assurance and citing unreliable product quality.

39. Due to defendants' failure to immediately cure and remedy the defect, by shipping defect-free products and reimbursing for plaintiff's then-losses, or reimbursing plaintiff's purchase-money after its officers "confirmed" on repeated emails that at least $248,408 was due and owing to plaintiff, so that plaintiff could provide adequate assurance of continued or at least future reliability, or cover its business operations through a third-party supplier, plaintiff lost its business with no opportunity for plaintiff to recover, and no ability to transition to other, new customers.

## CLAIMS FOR RELIEF

### Count One – Breach of Agreement

40. The preceding allegations are incorporated here, by reference.

41. At all relevant times, there existed an agreement between plaintiff and defendants for the sale and purchase of Suntek brand tinting film products. The original, written agreement between

Commonwealth and plaintiff was converted into an oral agreement plus Purchase Order-to-Purchase Order agreement and relationship.

42. Defendants breach the agreement and caused plaintiff to suffer financial and business losses. Plaintiffs losses include the all or substantial part of the 2015-16 product line; profits from those products and profits from the continued, future sale of products. Plaintiff's initial financial losses were at least $248,408 in defective goods that were not reimbursed or replaced; eventually plaintiff went out of business and suffered losses of business into the future.

43. Plaintiff is entitled reasonable damages including expectation damages, consequential damages and fees and costs.

**Count Two – Breach of Covenant of Good Faith and Fair Dealing**

44. The preceding allegations are incorporated here, by reference.

45. There exists an implied covenant of good faith and fair dealing which was part and parcel of the business agreement and dealings between the parties. In the context of this case, there existed an implied covenant that defect-free products would be sold and delivered and, if defects were confirmed, defendants would take immediate action to cure the defects and to restore plaintiff in a good a position as plaintiff would be without the defects rolling in; to indemnify plaintiff from product liability or defect claims; and to prevent plaintiff from going out of business due to defendant's inaction. Defendant breached this covenant by its failure to deliver defect-free goods; and its failure to replace the defective goods with defect-free goods when required to do so and by insisting on a general waiver of plaintiff's rights as condition precedent to its cure of its own defective supply. These and other actions of defendant caused plaintiff's losses. Plaintiff's initial financial losses were at least $248,408 in defective goods that were not

14

reimbursed or replaced; eventually plaintiff went out of business and suffered losses of business into the future. Plaintiff is entitled reasonable damages including expectation damages, consequential damages and fees and costs.

### Count Three – Unjust Enrichment

46. The preceding allegations are incorporated here, by reference.

47. Plaintiff paid for all products including the defective products sold by defendants. Defendants have failed to return plaintiff's payments made on account of defective products; defendants have repeatedly attempted to extract a General Release as a condition of fulfilling its basic contractual duty; has failed to return the money paid by plaintiff for defective products which were admitted by defendant as being "defective." The aggregate sums paid by plaintiff are in excess of $500,000 for products procured in 2015 and 2016, of which significant quantities were deemed defective by defendants. Defendants have not disputed their obligation to return at least $248,408 as of October 2016 as having received on account of defective goods, and have failed to return the money or to replace the goods.

48. By reason of these and other facts, stated above, defendants have been unjustly enriched at the expense of plaintiff, and plaintiff has suffered losses. Plaintiff is entitled reasonable damages including expectation damages, consequential damages and fees and costs.

### Count Four – UCC Sales Violation

49. The preceding allegations are incorporated here, by reference.

50. By reason of the foregoing facts, defendants breached the Uniform Commercial Code applicable to commercial sales transactions by selling and delivering defective goods, and by knowingly selling and delivering defective goods; by failing to replace the defective goods and by failing to act

seasonably. Plaintiff's revocation of acceptance of delivery of the defective goods was justifiable and was warranted under UCC § 2-608 ("Revocation of acceptance in whole or in part"). Plaintiff is entitled to remedies under § 2-711, § 2-713, § 2-714, and § 2-715.

51. Defendants breach the agreement and caused plaintiff to suffer financial and business losses. Plaintiffs losses include the all or substantial part of the 2015-16 product line; profits from those products and profits from the continued, future sale of products. Plaintiff's initial financial losses were at least $248,408 in defective goods that were not reimbursed or replaced; eventually plaintiff went out of business and suffered losses of business into the future.

52. Plaintiff is entitled reasonable damages including expectation damages, consequential damages and fees and costs.

### Count Five – Misrepresentation

53. The preceding allegations are incorporated here, by reference.

54. Defendants were under duty to disclose truthfully whether the product mix was being changed or whether it was being continued in the same manner as when Commonwealth. Defendants were also under a duty to disclose truthfully whether the manufacturing defects had been fixed when the defects-claims were being processed in October 2016. On both occasions defendants provided false disclosures and intended plaintiff to rely upon its false disclosures.

55. As alleged in paragraph 16 above, before and after the 2014 merger of Commonwealth and Eastman, agents of Commonwealth including Jerry Robertson visited plaintiff's plant in South Korea and otherwise communicated with plaintiff and represented that the same product line would be continued to be manufactured using the same materials and processes as Commonwealth had established. This was

16

materially false in that from approximately latter 2015 or early 2016, defendants began to manufacture the Suntek tinting film without a key ingredient and sold it throughout the world as the "same product" as had previously been sold despite the fact it was not the same product.

56. In November 2016, defendants also represented that the defects had been cured as of mid-August and there would be no returns for the defects after the mid-August 2016 time line.

57. The facts relating to both issues were uniquely known only to defendants; and plaintiff had no means of independently verifying the veracity of such representations made in defendants' disclosures. Knowing that plaintiff's business life and death hung in the balance, defendants were under a duty to disclose truthful and accurate information but failed to do so. Instead, they intended to and actually did tell a knowingly false story so as to induce plaintiff to continue to do business with defendants and to persuade plaintiff not to seek alternative procurement from third-party suppliers. Defects did not cease as of mid-August 2016 but continued into latter September 2016 and beyond, from retailers.

58. Defendants also represented during their November 2016 discussion with plaintiff that plaintiff and a single other purchaser in Germany were the only two affected by defective goods. In fact, plaintiff believes that defendants customers elsewhere, including at least one in California and at least one in South America, suffered from the same type of defects.

59. Plaintiff reasonably relied upon defendants' representations by not seeking alternative sourcing and remaining loyal to the parties' business relationship. The reliance was reasonable because defendants, being experts in chemical manufacturing processes, assured that their representations were reliable and truthful. Plaintiff has been injured as plaintiff lost in excess of $248,408 worth of products to defects and lost is business due to the loss of its five major customers.

60. Defendants' misrepresentation was strategic, willful, deliberate and in bad faith with no regard for the business rights of plaintiff. Plaintiff is entitled reasonable damages including expectation damages, punitive damages, consequential damages and fees and costs.

WHEREFORE, plaintiff demands judgment against the defendants as follows:

A. compensatory damages including expectation damages;

B. punitive damages;

C. return of remaining products to defendants;

D. consequential damages, legal fees, expert fees, and costs;

E. any other relief the Court deems just and proper under the circumstances.

## JURY DEMAND

Under Federal Civil Rule 38, plaintiff demands a trial by jury.

Dated: April 29, 2019

/s/ Michael S. Kimm
Michael S. Kimm
KIMM LAW FIRM
*Attorneys Pro Hac Vice*
  *For Plaintiff Sae Han Sheet Co., Ltd.*